Filed 5/8/14  P. v. Navarrete CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B247600 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA386978) |
| v. | |
| DANNY NAVARRETE et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Frederick N. Wapner, Judge.  Affirmed with modifications.

John A. Colucci, under appointment by the Court of Appeal, for Defendant and Appellant, Danny Navarrete.

Orly Ahrony, under appointment for by the Court of Appeal, for Defendant and Appellant, Juan Carlos Guardaro.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Mary Sanchez and Louis W. Karlin, Deputy Attorneys General, for Plaintiff and Respondent.

Appellants Danny Navarrete and Juan Carlos Guardado were convicted, following a jury trial, of the first degree murder of Rodolfo Melendez in violation of Penal Code[1] section 187, subdivision (a). The jury found true the allegations that appellants committed the murder for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1)(C). The jury also found true the allegations that appellant Navarrete personally used and discharged a firearm causing death within the meaning of section 12022.53. The jury found true the allegation as to appellant Guardado that a principal personally used and discharged a firearm in the commission of the murder within the meaning of section 12022.53. The trial court sentenced appellants to 25 years to life in prison for the murder conviction, plus 25 years to life for the firearm enhancement.

Appellants appeal from the judgment of conviction, contending the trial court erred in admitting an out-of-court statement by appellant Guardado and imposing and staying a ten-year enhancement term for the gang allegation. Appellant Guardado contends his counsel was ineffective for failing to request a limiting instruction for evidence of his prior bad acts. He further contends there is insufficient evidence to support his conviction for first degree murder. We order the ten-year enhancement term stricken and replaced with a minimum parole eligibility term. We affirm the judgment of conviction in all other respects.

Facts

In the evening of August 14, 2010, Angel Medina drove his family and Rodolpho Melendez to a party near 84th Place and Main Street. Melendez was a member of the 18th Street gang. The party was in territory claimed by a rival gang, Sur Trece. From the party, Medina drove Melendez to pick up his car so that Melendez could leave the party when he wished. The two drove back to the party separately. As Medina turned onto 84th Place, he saw Melendez parked in front of a tire shop near Main Street. This

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

2

location was across the street from a Sur Trece hang-out. Medina drove past Melendez's car and noticed two Hispanic men walking across the street toward Melendez's car.

Medina pulled over and saw the men go up to Melendez's car. One man wore a dark shirt and a baseball cap and the other was bald and wore a striped shirt. The man in the striped shirt knocked on the car window. They then appeared to be talking with Melendez. One of the men made a gang sign. Medina then heard a gunshot.

The two men ran back across the street. The man wearing the cap handed an object to the man wearing the striped shirt. The man in the striped shirt ran past Medina's vehicle and made a gang sign. Medina was afraid. He went back to the party and told his family what had happened.

The Medina family returned to Melendez's car. Melendez was barely alive, and was bleeding from a gunshot wound to his head. He soon died from the injury.

A few weeks after the shooting, police showed Medina some photographic line-ups. Medina identified appellant Guardado's photograph in one line-up (Exhibit 5) and said he was the shooter. He identified appellant Navarrete's photograph in another line-up (Exhibit 6) and said he was the accomplice. Medina told officers he was sure of his identification. At the preliminary hearing and at trial, Medina professed to be less sure of his identification.[2] He gave differing accounts of which man was the shooter. At the preliminary hearing, Medina testified that the person he identified in Exhibit 5 was appellant Guardado, who was wearing the striped shirt and was the shooter. At trial, Medina testified that appellant Navarrete was the person in the Exhibit 5 line-up, was the one wearing a baseball cap at the time of the shooting and was the shooter. Medina acknowledged that he was afraid of retribution for testifying.

The shooting was captured on video by surveillance cameras across the street. The prosecutor played the video at trial, but none of the cameras recorded the faces of the shooter and his accomplice with enough clarity to identity them.

---

[2]     At the preliminary hearing, Medina said he was 30 to 40 percent sure of his identifications in the photo line-ups. At trial, Medina said he was only 40 percent sure of his identifications.

The prosecution also offered the testimony of Ernie Arellano, who was a Sur Trece associate or member. In 2010, Arellano had known appellant Guardado for about a year. Appellant Guardado was a Sur Trece gang member. Arellano had also known appellant Navarrete for about a year. Appellant Navarrete was a member of the W2K gang. The W2K gang got along with the Sur Trece gang.

Before trial, Arellano told Detective Ferreria that appellant Guardado warned him that he and appellant Navarrete had caught an 18th Streeter "slippin'" (unprepared) and to lay low until everything calmed down. At the preliminary hearing and at trial, he denied making this statement. At trial, the prosecution played the audio-recording of Arellano's July 24, 2011 and November 9, 2012 interviews with Detective Ferreria. In these recordings, Arellano can be heard telling detectives about appellant Guardado's statement about catching the 18th Streeter "slippin.'"[3] After the prosecution played the recordings, Arellano testified that he was telling the truth in the interviews.

Arellano testified at trial that he was afraid of appellants. He feared that his testimony would result in violent retribution against himself and his family. At one point, he refused to return to court after a break because he was afraid of being seen by appellants' family members. He was arrested and ordered to return to court. When he returned to court, he acknowledged that police had relocated him in October 2011 and were assisting him with rent and meal payments.

The prosecution also presented the testimony of Luis Canales, who was a Sur Trece associate or member. He was arrested for a probation violation on January 21, 2012, for possession of body armor. At that time, he described himself as "a taxi for the homies."

Canales knew both appellants. Appellant Guardado and appellant Navarrete appeared to be good friends. The appearance of both men was different at the time of trial than it had been at the time of the Melendez shooting in 2010. At that time, appellant Navarrete had a shaved head. Appellant Guardado's hair looked different.

---

[3]     There are a number of inconsistencies in Arellano's account of the "slippin'" statements in the interview.

At the time of the shooting, Canales was across the street at the home of a Sur Trece member. Other Sur Trece members were there, including appellant Guardado. Arellano was also present. Canales and the others saw Melendez park his car. Appellant Guardado walked across the street. Canales heard a gunshot from that direction, and everyone scattered. When Canales was shown a video of the shooting, he stated that appellant Navarrete was the one wearing the hat and appellant Guardado was the one wearing the striped shirt.

A recording of Canales's November 14, 2012 interview was played for the jury. In it, he stated that appellant Guardado and appellant Navarrete went across the street and "banged" on the person in the car. Canales then testified that this statement was true. He saw both appellants walk across the street and heard the gunshot. His statements were based on seeing the shooting, not on viewing the video.

Canales was afraid of retribution for testifying. Like Arellano, Canales had been relocated and was receiving payments from the police for food and lodging.

The prosecution also presented the testimony of Los Angeles Police Department Officer Guillermo de la Riva, who testified as a gang expert. According to the officer, Sur Trece had about 25 members at the time of the Melendez killing. WTK (or W2K) was a smaller associated gang or clique. The main activities of Sur Trece were drive-by shootings, murders, assaults, robberies, extortions and narcotics sales. Committing a serious crime such as murder would allow a person to gain respect within the gang and move up in the gang hierarchy.

Sur Trece's main rival was the 18th Street gang. In late 2009, Sur Trece had taken over territory controlled by 18th Street. At the time of the Melendez killing, the 18th Street gang was actively trying to regain control of its lost territory. Sur Trece was resisting. There were multiple incidents in which members of the two gangs shot at each other. If a Sur Trece member encountered a rival gang member in Sur Trece territory, he would have to confront the rival or face penalties from his fellow gang members. Melendez was killed in the heart of Sur Trece territory.

5

According to Officer de la Riva, Arellano and Canales were members of Sur Trece at the time of the Melendez killing, as was appellant Guardado. Appellant Navarrete was a member of WTK. Melendez was a member of the 18th Street gang with numerous gang tattoos on his arms and face.

Officer de la Riva opined that if a shooting occurred in the manner described by the prosecution witnesses, it would have been for the benefit of the Sur Trece gang. The Sur Trece gang members would have to confront the stranger to find out if he was planning an attack. By shooting the stranger, the gang members instilled fear in the community and would cause rival gang members to think twice about going into Sur Trece territory. According to Officer De La Riva, the shooting was carried out in a typical gang manner, with one gunman and one person acting as a lookout.

Appellant Navarrete presented no evidence in his defense.

Appellant Guardado called Detective Ferreria, who testified that although Canales did not identify appellant Guardado from the surveillance video during the recorded portion of the police interview on July 24, 2011, Canales did identify him at the detective's desk during an unrecorded period. Arellano also identified appellant Navarrete from the video on that date, but this identification also was not recorded because the detective forgot to turn the recorder on.

## Discussion

### 1. Arellano's statements to police

Appellants contend the trial court erred in admitting Arellano's statements to police concerning appellant Guardado's admissions about catching an 18th Streeter "slippin.'" They claim the statements were coerced and involuntary and their admission violated appellants' federal constitutional rights to due process and a fair trial.

#### a. Applicable law

It is the burden of a defendant seeking to exclude testimony of a third-party witness as being coerced to establish that the statement was involuntary. (*People v.*

6

*Douglas* (1990) 50 Cal.3d 468, 500, overruled on other grounds by *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4.)  A defendant may only challenge the admission of a third party witness's statement when the evidence would violate the defendant's own right to due process of the law and a fair trial.  (*People v. Jenkins* (2000) 22 Cal.4th 900, 966; *People v. Badgett* (1995) 10 Cal.4th 330, 347.)  This is so because "the primary purpose of excluding coerced testimony of third parties is to assure the reliability of the trial proceedings."  (*People v. Badgett, supra*, 10 Cal.4th at p. 347.)

No single factor is dispositive in evaluating the voluntariness of a statement. (*People v. Williams* (1997) 16 Cal.4th 635, 661.)  "In deciding the question of voluntariness, the United States Supreme Court has directed courts to consider 'the totality of circumstances.'"  (*Id.* at p. 660, quoting *Withrow v. Williams* (1993) 507 U.S. 680, 693-694.)  Relevant considerations include "'the crucial element'" of police coercion; the length, location and continuity of the interview; and the interviewee's defendant's maturity, education, physical condition and mental health.  (*People v. Williams, supra*, 16 Cal.4th at p. 661.)  Coercive conduct alone is not sufficient for reversal.  "A confession is not involuntary unless the coercive police conduct and the defendant's statement are casually related."  (*People v. Williams* (2010) 49 Cal.4th 405, 437.)

Ultimately, the question is whether the statement is the product of an "'essentially free and unconstrained choice'" or whether the defendant's "'will has been overborne and his capacity for self-determination critically impaired'" by coercion. (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 225.)

Appellate courts "independently review the entire record to determine whether a witness's testimony was coerced, so as to render the defendant's trial unfair," while "defer[ing] to the trial court's credibility determinations, and to its findings of physical and chronological fact, insofar as they are supported by substantial evidence." (*People v. Boyer* (2006) 38 Cal.4th 412, 444.)  To the extent there is conflicting evidence regarding the alleged coercion, the reviewing court must accept the version most favorable to the People, to the extent supported by the record; however, if the facts are not in dispute, it

7

will review the record de novo. (See, e.g., *People v. Badgett, supra*, 10 Cal.4th at pp. 352-354; *People v. Anderson* (1990) 52 Cal.3d 453, 470.)

b. Proceedings below

The court held a hearing to determine the admissibility of Arellano's statements. The court found Arellano's statements to police were not coerced and were admissible. The court also found that Arellano was not a "suggestible" witness, was "trying his best to answer the questions," and was "pretty smart actually." The court based its ruling on Arellano's testimony at the hearing and the transcript of the police interview of Arellano.

c. Analysis

An examination of the factors listed in *People v. Williams, supra,* 16 Cal.4th at p. 661 does not show coercion. Arellano was advised of his *Miranda*[4] rights before the police interview began. The interview was not lengthy. There is nothing about the location of the interview which suggests that it impaired Arellano's ability to give voluntary answers. Arellano was only 19, but he was mature for his age. He was taking care of his daughter and working. The court found that Arellano was "pretty smart actually." Arellano's answers to questions during the interview and at the hearing support this conclusion. Arellano was not injured, and gave no indication that he was hungry or thirsty. In addition, the detectives repeatedly told Arellano that they only wanted the truth. When Arellano provided information, the detectives tested him, asking how he knew. They did not provide their own version of events for Arellano to adopt.

Appellants claim the police used coercion in the form of threats of criminal charges and implied promises of leniency. Appellant Guardado's argument focuses on Arellano's testimony at the hearing while appellant Navarrete's focuses on the interview itself. Each joins the other's contentions.

---

[4]     *Miranda v. Arizona* (1966) 384 U.S. 436.

8

Appellant Guardado first points to the presence of Detective Ferreria at the hearing as coercive. Trial counsel objected to the detective's presence at the hearing on the ground that it was coercive to have him there when the purpose of the hearing was to determine whether he coerced Arellano. The trial court overruled the objection. Counsel offered no authority to support his contention in the trial court and offers none on appeal. Any witness who considers changing a previous statement can expect to be impeached on this point, and the impeachment will frequently come from a person who heard the previous statements. In this case, Detective Ferreria was the prosecution's investigating officer, and so there was nothing unusual or improper in his presence. His mere presence was not coercive.

Appellant Guardado next points to a series of questions and answers during cross-examination of Arellano at the hearing to show that the detectives were threatening Arellano with criminal charges in order to get him to cooperate. Defense counsel: "So you felt very strongly motivated to cooperate with the police; correct?" Arellano: "Yeah." Defense counsel: "In fact didn't the detective tell you many, many, many, many times that you were gonna get thrown under the bus for this very crime?" Arellano: "Yes." Defense counsel: "And you believed him, didn't you?" Arellano: "Yes." The transcript of the interview shows that the detective was telling Arellano that other people were trying to throw him under the bus.

Appellant Guardado claims, inaccurately, that Arellano testified "that he talked to the police because he believed the Detective would make sure that he [would] go down for the murder." In fact, defense counsel asked, "You've already said how your – your reason for talking to the detectives, despite having a lot of fear when talking to the police about this, your reason was you thought that, in your mind, you could go down for the murder yourself; correct?" Arellano agreed. As Arellano subsequently explained, however, he believed he might be convicted of the murder "[b]ecause in the video, you couldn't tell who it was" and "[b]ecause other people were trying to say it was me in that video." Thus, the testimony quoted by appellant Guardado does not show that Arellano

9

spoke with the detectives because he believed they would "make sure" he was convicted of the murder. Arellano's fear, if any, was of other people incriminating him.

As appellants point out, the detective's statements during the interview that others had thrown Arellano under the bus were apparently a ruse. Appellant Navarrete contends the ruse qualified as coercion.

Ruses are permissible, as long as the ruse is not likely to produce an untrue statement. (*People v. Chutan* (1999) 72 Cal.App.4th 1276, 1280, citing inter alia *Frazier v. Cupp* (1969) 394 U.S. 731, 739 [officer falsely told the suspect his accomplice had been captured and had confessed].) Appellant Navarrete relies primarily on *People v. Lee* (2002) 95 Cal.App.4th 772 to show that the ruse in this case was coercive. In *Lee*, the police told the witness that he had been incriminated by a polygraph test, then "threatened him with a murder charge unless he named the defendant." (*People v. Quiroz* (2013) 215 Cal.App.4th 65, 79.) "The vice in *Lee* was that the interrogation was 'not designed to produce the truth as [the witness] knew it but to support a version of events the police had already decided upon.'" (*Ibid*.)[5] Here, the detectives did not tell Arellano that they believed he was guilty of the murder and did not tell him whom they wanted him to incriminate or what they wanted him to say. Thus, their ruse was permissible.

Appellant Guardado also points to questions by defense counsel about Arellano's daughter to show that the detectives threatened to separate appellant from his daughter if he did not cooperate. Defense counsel asked, "And thinking about your daughter, you felt almost desperate to tell the policeman what he wanted to hear; correct?" Arellano agreed. Defense counsel continued, asking "Did he not even mention on many, many, many times the detective brought up your daughter, your family?" Arellano agreed. Defense counsel asked, "And that made you very, very, very scared; correct?" Arellano agreed. Appellant Guardado contends Arellano was "horrified that he may not see his

---

[5]     Similarly, in *People v. McClary* (1977) 20 Cal.3d 218, also relied upon by appellant Navarrete, the police promised the defendant leniency if she changed her story to match the facts represented by the police, and threatened to charge her with murder if she did not. (*Id*. at pp. 224, 229.) That was not the situation here.

young daughter again if he did not testify to Detective Ferreria's liking." Nothing in the quoted questions or any other testimony shows Arellano believed he had to testify to the detective's liking or believed he would "never" see his daughter again.

The transcript of the interview does reveal numerous mentions of Arellano's daughter. Generally, these references were made during a discussion about whether Arellano wanted to get out of the gang life. Appellant Navarrete is correct that at one point the detectives told Arellano he would be watched twenty-four hours a day seven days a week and "when you end up buying dope somewhere, when you least expect it, you're going to get arrested and you're never going to see your daughter again." Even if this is construed as a threat, it is a hollow one. Arellano would have nothing to worry about as long as he followed the law, and it is extremely unlikely that such intensive surveillance would last very long, assuming it ever started to begin with. Further, as Arellano was no doubt aware, a conviction for drug possession does not carry a life sentence, and would not result in Arellano never seeing his daughter again.

Appellants' reliance on two federal cases to show coercion in the detective's mention of Arellano's daughter is misplaced. In *United States v. Tingle* (9th Cir. 1981) 658 F.2d 1332, the police officer's statement to the suspect was similar to the one in this case, but the suspect's response was shaking and crying for ten minutes. (*Id*. at p. 1334.) Thus, the suspect clearly took the threat as a real one, and her will was overborne. Nothing similar occurred during Arellano's interview. As the trial court found, the statement was not "the kind of pressure where okay, just - - I'll tell you anything you want to know, just let me go home to my daughter." In *Lynumn v. Illinois* (1963) 372 U.S. 528, the suspect "had no previous experience with the criminal law, and had no reason not to believe that the police had ample power to carry out their threats." (*Id*. at p. 534.) That was not Arellano's situation. He had every reason to disbelieve the detectives.

Appellant Guardado also claims that since the interview took place after Arellano was arrested for a crime committed with his brother, it "is highly probable that Detective Ferreria offered favorable treatment if he were to testify against appellant." It is not clear

11

when the arrest with Arellano's brother took place, but it does not appear to have been the arrest that occurred on the same date as the interview. There is no evidence in the record to suggest that detectives offered favorable treatment to Arellano on the arrest with his brother. To the contrary, Arellano was asked if the detectives told him that he would get "some sort of legal benefit in any criminal cases or any criminal actions that you might be doing in exchange for this – in exchange for working with them?" Arellano replied, "No." When asked if he received any benefits at all from the police, he replied, "I didn't gain nothing. And I didn't - - well basically, all I got was just a relocation. That's all I got. I didn't get nothing out of it, or I didn't get something to benefit out of it."

Appellant Navarrete makes a similar claim to appellant Guardado's, arguing that the interview was coercive because Arellano was arrested just before the interview on a drug charge, but the detectives told him during the interview that they were not interested in the drug activity. Appellant claims that "implicit in this statement is a promise of leniency" that Arellano would not be prosecuted for the drug offense if he cooperated. The detectives' statements show the opposite. Detective Ferreria said "[W]e're not here for dope." Detective Kellum stated, "We don't do dope" and "We're not here for dope" and "If he had a pound of dope, I – I could care less." Detective Kellum also stated, "If he's selling, dealing, more power to him" and "Unless he's dead or about to die, I don't care about what he's doing." Detective Kellum also told Arellano that if he was not honest in his answers, he would "be [there] for four or five hours." These statements cannot reasonably be understood as promising to forgo drug charges only if appellant agreed to cooperate.[6]

Appellants have not met their burden of showing that Arellano's statements to police were coerced or involuntary. Arellano's statements were properly admitted and did not violate appellant's federal constitutional rights to due process and a fair trial.

---

[6]     Further, the detectives' statement to Arellano that he would be watched 24/7 and arrested the next time he bought drugs shows that they were not holding his current drug arrest over his head.

2. Trial testimony

Appellant Navarrete contends Arellano's trial testimony was coerced and should not have been admitted. In part, he contends the testimony was coerced because parts of his coerced pre-trial statements were played in court. Since his claim that the pre-trial statements were coerced has failed, this related contention fails as well. Appellant Navarrete also contends Arellano's testimony was coerced because he was "challenged" at trial with his interview statements and placed in the "untenable position of having to admit lying to the police or saying it was the truth" and because he was arrested as a material witness when he refused to testify.[7] He contends the admission of the testimony violated his federal constitutional rights to due process and a fair trial.

"A claim that a witness's [trial] testimony is coerced . . . cannot prevail simply on grounds that the testimony is the 'fruit' of some constitutional transgression against the witness. Instead, the defendant must demonstrate how such misconduct, if any, has directly impaired the free and voluntary nature of the anticipated testimony in the trial itself." (*People v. Boyer, supra*, 38 Cal.4th at p. 444.) "'[D]efendant can prevail on his suppression claim only if he can show that the trial testimony given by [the third party] was involuntary at the time it was given.' [Citation.]" (*People v. Badgett, supra*, 10 Cal.4th at p. 347.)

Appellant Navarrete has cited no cases holding that arresting a reluctant witness results in coerced testimony. We see no basis for holding that the lawful compulsion to testify as a material witness can amount to unconstitutional coercion.[8]

---

[7] To the extent that appellant Guardado contends Arellano's trial testimony was coerced because he was receiving relocation payments, we do not agree. Appellant Guardado contends that if Arellano failed to testify against appellants he would not get any money. In fact, Arellano did attempt to avoid testifying, going so far as to leave during a lunch break. He had to be arrested and ordered to return to court to complete his testimony, demonstrating that he was not testifying to get money.

[8] We note that Arellano initially refused to testify out of fear of gang retaliation, not fear of the police.

13

Appellant Navarrete has also failed to cite any cases holding that impeachment of a witness with his or her prior statements results in coerced testimony. There is no basis for holding, in effect, that requiring a witness to take an oath to tell the truth is coercive in situations where the oath requires the witness to admit that he was not truthful in earlier out of court statements.

Importantly, Arellano's trial testimony was subject to cross-examination and impeachment. These tools, together with appellants' knowledge of the circumstances of Arellano's police interview, enabled appellants to challenge the reliability of Arellano's testimony. (See *People v. Douglas, supra*, 50 Cal.3d at p. 503.) The jury was then able to assess Arellano's credibility and reliability. Appellant Navarrete's claim fails. His federal constitutional rights to due process and a fair trial were not violated.


3. Evidence Code section 1230

The trial court admitted appellant Guardado's statement to Arellano that appellant Guardado and appellant Navarrete "caught an F-18 slippin'" as a statement against penal interest. (Evid. Code § 1230.) Appellant Navarrete contends the court erred, because that portion of the statement which referred to appellant Navarrete's involvement was not "specifically disserving" to appellant Guardado's penal interest, as required by Evidence Code section 1230. He further contends the admission of the statement violated his federal constitutional right to due process.


a. Applicable law

"Evidence Code section 1230 provides that the out-of-court declaration of an unavailable witness may be admitted for its truth if the statement, when made, was against the declarant's penal interest." (*People v. Lucas* (1995) 12 Cal.4th 415, 462.) The proponent of such evidence "must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." (*People v. Duarte* (2000) 24 Cal.4th 603, 610-611.)

14

The trial court's ruling under Evidence Code section 1230 is reviewed for an abuse of discretion. (*People v. Lawley* (2002) 27 Cal.4th 102, 154; *People v. Gordon* (1990) 50 Cal.3d 1223, 1250-1253; *People v. Arauz* (2012) 210 Cal.App.4th 1394, 1400.) The court's ruling "will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

In considering whether the declaration was sufficiently trustworthy, the court may take into account the words used, the circumstances under which they were written, and the declarant's possible motivation and relationship to the defendant. (*People v. Cudjo* (1993) 6 Cal.4th 585, 607.) In this context, the least reliable circumstance is one in which the declarant has been arrested and tries to improve his situation by deflecting responsibility onto others, while the most reliable circumstance is one in which the statement is made between friends in a non-coercive setting. (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 334-335.)

Here, appellant Guardado's statement about his own involvement in the shooting subjected him to the risk of criminal liability, as it amounted to an admission of murder. Appellant Guardado's statement also implicated appellant Navarrete, but the mere fact that the hearsay declarant's statement also implicated another does not automatically render it unreliable or inadmissible. (*People v. Tran* (2013) 215 Cal.App.4th 1207, 1220; see *Arauz, supra*, 210 Cal.App.4th at p. 1397 ["Where, as here, an accomplice inculpates himself and his codefendant to a fellow inmate/informant, his statements, if trustworthy, are admissible in the codefendant's trial."].) However, "[s]pecial attention must be paid to any statements that tend to inculpate the nondeclarant. This is so because a statement's content is most reliable in that portion which inculpates the declarant. It is least reliable in that portion which shifts responsibility." (*People v. Greenberger, supra*, 58 Cal.App.4th at p. 335.)

"Under the rule of [*People v. Leach* (1975) 15 Cal.3d 419], a hearsay statement 'which is in part inculpatory and in part exculpatory (e.g., one which admits some complicity but places the major responsibility on others) does not meet the test of

15

trustworthiness and is thus inadmissible.' [Citations.]" (*People v. Duarte, supra*, 24 Cal.4th at p. 612.)[9] To be admissible as a statement against penal interest, the declarant's statement must be "truly self-inculpatory, rather than merely [an] attempt[ ] to shift blame or curry favor." (*Williamson v. United States* (1994) 512 U.S. 594, 603; see *Duarte, supra*, at pp. 611-612.)

Here, the circumstances all support the trial court's finding of reliability. Appellant Guardado made the statement to Arellano, who was either a gang member or an associate. (*People v. Tran, supra*, 215 Cal.App.4th at p. 1220 ["the circumstance most indicative of reliability is where an incriminating conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures"].) Appellant Guardado made the statement soon after the murder, to explain his warning to Arellano that he should be on the alert for attacks by F-18 gang members. (See *People v. Tran, supra*, 215 Cal.App.4th at p. 1220 ["the timing and urgency of [declarant's] conduct further support the reliability of his statement"].)

Appellant Navarrete contends appellant Guardado's statement was not reliable because it "spread the blame" to appellant Navarrete. The question is not whether the declarant "spreads" blame, but whether he attempts to "shift" blame, that is, attempts to make another look more guilty and the declarant less guilty. That appellant Guardado did not do. Nothing in appellant Guardado's mention of appellant Navarrete suggested that appellant Navarrete was more to blame for the murder. The statement suggests equal responsibility for the crime.

Appellant Navarrete's reliance on *People v. Lawley, supra*, 27 Cal.4th at p. 102 is misplaced. In that case, the defense wished to offer the declarant's statement that he

---

[9]     In *Leach*, our Supreme Court stated that Evidence Code section 1230 does not apply to "evidence of any statement or portion of a statement not itself specifically disserving to the interests of the declarant. [Fn.]" (*People v. Leach, supra,* 15 Cal.3d at pp. 441-442.) It is from this case that appellant Navarrete derives the "specifically disserving" language that he uses throughout his argument. As the above-quoted excerpt from *Duarte* shows, the *Leach* rule applies to statements in which the declarant attempts to place "major responsibility" on someone else.

16

committed the murder and was hired to do so by the Aryan Brotherhood. The court found the identity of the entity which hired the declarant did not increase his culpability and so was not disserving to the declarant. Here, the statement including appellant Navarrete did have a tendency to be disserving to appellant Guardado, as it supported the allegation that the killing was done for the benefit of a criminal gang within the meaning of section 186.22. Appellant Guardado was a member of the Sur Trece gang and appellant Navarrete was a member of an associated gang or clique, and the victim was a member of a rival gang. Appellant Guardado's statement showed that he committed the crime with a fellow gang member, a fact which can satisfy one of the requirements of section 186.22.

The trial court did not abuse its discretion in finding that the statements were admissible as a declaration against penal interest. (See *People v. Arauz, supra*, 210 Cal.App.4th at p. 1401.) There was no violation of appellant Navarrete's federal constitutional right to due process.


4. Ineffective assistance of counsel

In his interview with police, Canales stated that he was more afraid of appellant Guardado than appellant Navarrete because he had seen appellant Guardado fight with rivals. A recording of Canales's statement was played at trial. Appellant Guardado contends his trial counsel was ineffective in failing to request an instruction telling the jury the evidence could not be considering as showing a bad character or criminal disposition.

Both the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution guarantee defendant the right to the assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.)

Appellant has the burden of proving ineffective assistance of counsel. (*People v. Pope* (1979) 23 Cal.3d 412, 425.) In order to establish such a claim, appellant must show that his counsel's performance fell below an objective standard of reasonableness, and that, but for counsel's error, a different result would have been reasonably probable.

17

(*Strickland v. Washington, supra,* 466 U.S. at pp. 687-688, 694; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington*, *supra*, 466 U.S. at p. 694.)

When an appellant makes an ineffective assistance claim on appeal, we look to see if the record contains any explanation for the challenged aspects of the representation. If the record is silent, then the contention must be rejected "'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation [citation].'" (*People v. Haskett* (1990) 52 Cal.3d 210, 248.)

Here, the evidence of appellant Guardado's fighting was introduced to explain Canales's fear of appellant Guardado, which in turn explained why Canales delayed identifying appellant Guardado. Thus, the evidence was relevant. It was not particularly inflammatory. A reasonable attorney could have concluded, as a tactical matter, that the risk of a limiting instruction outweighed any benefit the instruction might provide. (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1053-1054.)

Since there could be a satisfactory explanation for counsel's failure to request the instruction, the ineffective assistance claim must be rejected on appeal. (*People v. Haskett, supra*, 52 Cal.3d at p. 248; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.) Generally, ineffective assistance of counsel claims are more appropriately raised in a habeas corpus proceeding. (*People v. Mendoza Tello, supra*, 15 Cal.4th at p. 267.)

5. Sufficiency of the evidence

Appellant Guardado contends there is insufficient evidence to show that he aided and abetted the murder, and so insufficient evidence to support the conviction.[10] He also

---

[10] Appellant Guardado points out the jury found appellant Navarrete personally used a weapon in the commission of the murder but found as to appellant Guardado only that a principal was armed in the commission of the murder. He concludes, reasonably, that the jury convicted him as an aider and abettor.

contends there is insufficient evidence to support the finding that he premeditated and deliberated.  We do not agree.

"In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves.  Rather, we examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  [Citation.]  [¶]  The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations.  [Citation.]  [I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.  [Citation.]  We do not reweigh evidence or reevaluate a witness's credibility.  [Citations.]" (*People v. Nelson* (2011) 51 Cal.4th 198, 210 [internal quotation marks omitted].)

### a. Aiding and abetting

"'All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed.'" (*People v. McCoy* (2001) 25 Cal.4th 1111, 1116-1117, quoting § 31.)  Under a direct theory of aiding and abetting, the defendant must know and share the perpetrator's intent to be found liable. (*Ibid.*)

"Whether a person has aided and abetted in the commission of a crime is a question of fact, and on appeal all conflicts in the evidence and attendant reasonable inferences are resolved in favor of the judgment.  Among the factors which may be considered in determining aiding and abetting are: presence at the crime scene, companionship, and conduct before and after the offense." (*In re Juan G.* (2003) 112 Cal.App.4th 1, 5.)  Mere presence at a crime scene does not suffice to establish aiding and abetting.  (*Ibid.*)

19

Here, there was ample evidence that appellant Guardado acted in concert with appellant Navarrete before, during and after the murder.

Canales testified that the victim parked across the street from a Sur Trece hangout, at a time when appellants and other Sur Trece members were present. He saw appellants walk up to the victim's car together and make a gang challenge just before the fatal gunshot was fired.

Medina saw two Hispanic males matching appellants' descriptions approach the victim's car. The one wearing a striped shirt—identified by Canales as appellant Guardado—knocked on the car's window and made a Sur Trece gang sign at Melendez. After the shooting, Medina saw the man in the striped shirt receive an object from the other's hand as they ran away.

Gang expert de la Riva testified that the shooting was committed in typical gang fashion because there was one gunman who was supported by a lookout. His testimony also showed a gang-related motive for the shooting on the part of both defendants. The victim was a member of a rival gang and was in Sur Trece's territory. If a Sur Trece member encountered such a situation, he would face penalties from his fellow gang members if he failed to confront the rival.

This evidence supports a reasonable inference that appellant Guardado assisted in the murder by identifying himself and appellant Navarrete as Sur Trece, serving as a lookout, and taking some object related to the murder, possibly the murder weapon, from appellant Navarrete after the shooting. Further, in appellant Guardado's statement to Arellano, appellant Guardado took joint responsibility for the killing: "'We caught a F18 [Fake-18] slipping'"; "we had um, just caught an 18th Streeter slippin' and yo and what was gonna happen"; "me and Danny caught some enemy slippin' and you already know what's gonna happen, so lay low until everythings [sic] calms down" Appellant Guardado's statement supports an inference of shared intent to kill. In contrast, there is no evidence in the record which supports a reasonable inference that appellant Guardado was surprised or shocked by appellant Navarrete's action in shooting Melendez.

20

b. Premeditation and deliberation

First degree murder requires a finding that the defendant acted willfully, deliberately and with premeditation.  (§ 189.)  "Deliberation" refers to the careful weighing of considerations in forming a course of action and "premeditation" means thought over in advance.  (*People v. Solomon* (2010) 49 Cal.4th 792, 812; *People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)  "'Premeditation and deliberation can occur in a brief interval.  "The test is not time, but reflection.  'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.'"" [Citation.]"  (*People v. Solomon, supra*, 49 Cal.4th at p. 812.)  Deliberation and premeditation may occur within a very short time period, however.  (*Ibid*.)  "The test is not time, but reflection."  (*People v. Bloyd* (1987) 43 Cal.3d 333, 348.)

There are three common categories of evidence bearing on the existence of the premeditation and deliberation in the context of murder—planning activity, motive, and the manner of killing.  (*People v. Perez* (1992) 2 Cal.4th 1117, 1125; *People v. Anderson* (1968) 70 Cal.2d 15, 25–27.)  These "factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive."  (*People v. Perez, supra*, 2 Cal.4th at p. 1125.)  Their purpose "'was to aid reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.'"  (*People v. Solomon, supra*, 49 Cal.4th at p. 812.)

Here, appellants were at a gang hang-out with fellow gang members when the victim parked his car across the street from them.  They noticed that the victim was unprepared ("slippin'").  They walked up to the victim with a loaded gun and made a gang challenge before shooting.  This supports a reasonable inference of planning.  The gang expert's testimony provided evidence of a strong motive for the shooting.  The manner of shooting, a close range gunshot to the head of the unarmed victim, shows preexisting reflection.  Thus, there is more than sufficient evidence to support the jury's finding of premeditation and deliberation.

21

6. Cumulative error

Appellants contend that even if the errors in this case were not prejudicial when considered individually, they were prejudicial when considered cumulatively. We have found no error, so there is no cumulative effect.


7. Gang enhancement

Appellants contend the trial court erred in imposing a ten year enhancement pursuant to section 186.22, subdivision (b)(1)(C), then staying it pursuant to section 654. They contend, correctly, that this enhancement does not apply when a defendant is sentenced to an indeterminate term. Appellants further contend the enhancement should be stricken.

"Where, as here, a defendant is sentenced to an indeterminate life term for attempted murder, the 15 year-parole eligibility provision of section 186.22, subdivision (b)(5) applies rather than the 10-year gang enhancement." (*People v. Arauz, supra*, 210 Cal.App.4th at pp. 1404-1405.) We will order the abstract of judgment corrected accordingly.

Disposition

The ten year enhancement term imposed pursuant to section 186.22, subdivision (b)(1)(C) and then stayed pursuant to section 654 is ordered stricken. It is to be replaced with a minimum parole eligibility period of 15 years pursuant to section 186.22, subdivision (b)(5). The judgment of conviction is affirmed in all other respects.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



MINK, J.[*]


We concur:


MOSK, ACTING P. J.


KRIEGLER, J.

---

[*] Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.